**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BARTON WINDPOWER, LLC and** | ) | |
| **BUFFALO RIDGE I, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **13-cv-5329** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **NORTHERN INDIANA PUBLIC** | ) | |
| **SERVICE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Barton Windpower, LLC and Buffalo Ridge I, LLC are wind energy power plants respectively located in Iowa and South Dakota. Both are owned by Iberdrola Renewables, LLC, the second-largest operator of wind energy plants in the United States. Defendant Northern Indiana Public Service Company ("NIPSCO") contracted to purchase electricity generated by Iberdrola's Barton and Buffalo Ridge plants for a period of years at a set rate. NIPSCO would then sell that power to the Midcontinent Independent System Operator (the nonprofit regulator of the energy grid that covers the Midwest) at the market price. In this way, the contracts squarely placed the risk of a low market price on NIPSCO, and in return NIPSCO stood to benefit in the event of high prices.

Two contract provisions give NIPSCO the power to refuse to purchase electricity that Iberdrola's plants are capable of delivering. First, under the "Unexcused Failure to Take" provision, NIPSCO may decline to "take" the plants' power at any time, but if NIPSCO does so, it must pay Iberdrola what is known as the "Cost to Cover"—unless NIPSCO's failure to take the power is excused by a "Force Majeure Event." Second, under the "Voluntary Curtailment by

Buyer" provision, NIPSCO may order the plants to stop producing power, but if NIPSCO exercises that right, it again must pay Iberdrola the Cost to Cover.

A few years after these contracts went into effect, a regulatory change took place. This change required market participants like NIPSCO to set a minimum price at which to sell their wind power. When the market price falls below this minimum price, the participant's power plant receives an automatically generated order from the energy grid's regulator requiring that it cease delivering power to the grid. Since this regulatory change went into effect, the market price has fallen below NIPSCO's offer price many times, causing the Iberdrola plants to be taken offline. Iberdrola has billed NIPSCO the Cost to Cover for those time periods, but NIPSCO has refused to pay.

Iberdrola claims that NIPSCO's refusal to pay the Cost to Cover has breached the contracts by violating each of the provisions described above. In the alternative, Iberdrola also claims that, even if NIPSCO has not breached those provisions, it has violated the implied covenant of good faith and fair dealing by using a regulatory change to shift the risk of low market prices onto Iberdrola, the opposite of the allocation that the parties intended when entering into the contracts.

Both sides have moved for summary judgment, Iberdrola on its express contract claim and NIPSCO on both of Iberdrola's claims. The Court previously issued a minute order denying both motions with an opinion to follow [144]. Since that time, the parties have filed supplemental briefing based on an intervening Seventh Circuit opinion in a similar case, *Benton Cty. Wind Farm LLC v. Duke Energy Ind., Inc.*, 843 F.3d 298 (7th Cir. 2016). Upon further consideration of the original motions and in light of the *Benton* opinion, the Court now modifies its previous order by granting Iberdrola's motion for summary judgment and denying NIPSCO's.

# I.  Background[1]

## A.    The Parties

Iberdrola Renewables, the parent company of Barton Windpower and Buffalo Ridge I, is itself a subsidiary of Iberdrola, S.A., a Spanish renewable energy company with the largest renewable asset base of any company in the world. *See* Pls.' SOF ¶ 1. Buffalo Ridge is a 50-megawatt wind energy power plant in Brookings Ridge, South Dakota. *See id.* ¶ 2. Barton is a 160-megawatt wind energy power plant in Worth County, Iowa. *Id.* For the sake of simplicity, the Court will refer to Plaintiffs collectively as "Iberdrola."

NIPSCO is a public utility located in Merrillville, Indiana. Def.'s SOF ¶ 4. NIPSCO provides natural gas and electric power services to approximately one million customers across the service region encompassing Northern Indiana. *See* Pls.' SOF ¶ 3. Under NIPSCO's contracts with Iberdrola, NIPSCO is the sole energy buyer, or offtaker, for the energy produced at the Buffalo Ridge power plant. *Id.* ¶ 2. NIPSCO is one of two offtakers for the Barton power plant. *Id.*

## B.    The Electricity Grid

Power plants in the Midwest, including wind energy plants, feed the electricity they produce into a grid managed by Midcontinent Independent System Operator ("MISO"), a nonprofit organization regulated by the Federal Energy Regulatory Commission. *Id.* ¶ 7. MISO's grid spans fifteen Midwestern states and the Canadian province Manitoba. *Id.* MISO purchases electricity from producers and then sells that electricity to utilities that, in turn, sell it to consumers. *Id.* NIPSCO is a utility that purchases electricity from MISO to sell to consumers in Indiana, but NIPSCO also sells to MISO the electricity that Iberdrola produces in Iowa and South Dakota. *Id.* ¶¶ 8, 16; Def.'s SOF ¶¶ 4, 27.

---

[1]    The following facts are undisputed unless otherwise noted.

In managing the electricity grid, MISO must always be cognizant of the grid's physical limitations. The grid can become overwhelmed with electricity at times of high production and consumption. Pls.' SOF ¶ 19; Def.'s SOF ¶¶ 15–17. And because electricity cannot be stored, MISO must carefully balance supply with demand, both of which can be difficult to predict. Def.'s SOF ¶ 15. To maintain the reliability and efficiency of the grid, MISO has the authority to order a producer to curtail its output. *Id.* ¶ 28.

## C.    The Energy Markets

MISO uses the markets through which it purchases and sells power to help balance supply and demand and to protect the integrity of the grid. Pls.' SOF ¶ 19. One of these markets is called the "day-ahead" market, and the other is called the "real-time" market. *Id.* In the day-ahead market, market participants offer to deliver to MISO a specified amount of power at a set price on the following day. *Id.* ¶ 20. If MISO accepts the offer and the market participant delivers the power as scheduled, the participant will be paid the agreed price regardless of the market price at the time of delivery. *Id.* If MISO rejects the offer, the participant may still sell power to MISO in the real-time market. *Id.* ¶¶ 22–23. In the real-time market, the participant is paid the market price at the time of power delivery. *Id.* ¶ 23.

The market price that MISO pays for energy is known as the Locational Marginal Price ("LMP"). *Id.* ¶ 8. The LMP can change many times in a single day and vary between different areas of the grid. *Id.* ¶¶ 14, 17. MISO sets the LMP for a given location based on three factors. *Id.* ¶ 12. The first factor is the "marginal energy component." *Id.* This component reflects the market participants' offers to MISO relative to consumer demand. *Id.* ¶ 13. It is constant throughout the grid. *Id.* The second factor, the "marginal congestion component," reflects the costs of transmission congestion. *See id.* ¶¶ 12, 14. If more power is being produced in a particular area

of the grid than the transmission lines can accommodate, this component will be negative in that area, thereby reducing the financial incentive to deliver power and encouraging plants to go offline. *See id.* ¶ 14. This component can vary throughout the grid. *Id.* The third factor is the "marginal loss component." *Id.* ¶ 12. It captures the cost of transmission losses due to the physical infrastructure at each delivery point. *Id.* ¶ 15. Compared to the other two components, the marginal loss component is a relatively insignificant driver of the overall LMP. *See id.*

Sometimes the LMP in a particular area is negative. *Id.* ¶ 10. A negative LMP can occur when more electricity is being produced than consumers are demanding or when the amount of power being produced in a particular area is causing significant congestion on the grid. *Id.* When the LMP is negative, market participants like NIPSCO can stop generating power, or they can continue to generate power and sell it to MISO at the negative price (*i.e.*, pay MISO to take the power). *Id.* A market participant may be willing to sell power to MISO at negative prices if there is an opportunity cost for *not* delivering power—for example, if taking a plant offline is expensive or tax incentives will be lost for doing so. *Id.*

Additionally, a market participant who is supplying power to MISO when the LMP is negative will not always be required to pay MISO anything. For example, in the case of NIPSCO, if the LMP in the area where it sells power to MISO is equal to the LMP in Indiana (where NIPSCO buys power from MISO), then NIPSCO will break even. *Id.* ¶ 17. And if NIPSCO agrees in the day-ahead market to provide MISO with power at a particular price, MISO will pay the agreed price to the market participant regardless of the LMP at the time of delivery. *Id.* ¶ 20.

**D.     The Parties' Contracts**

The parties entered into two power purchase agreements ("PPAs") on November 7, 2007. *See* Def.'s SOF ¶ 5. One PPA was between NIPSCO and Barton; the other was between

NIPSCO and Buffalo Ridge. *Id.* The parties agree that the two PPAs are identical in all respects that are material to this case. *Id.* ¶ 7; Pls.' Resp. Def.'s SOF ¶ 7. The Court will provide an overview of the relevant portions of the PPAs here and will provide additional detail as it becomes necessary to the Court's analysis.

The basic agreement is found in Article 5 of the PPAs, entitled "Purchase and Sale." In that Article, NIPSCO agrees to purchase, and Iberdrola agrees to sell, "Buyer's Metered Output at the Delivery Point on an as-generated, instantaneous basis" for a set price. PPA § 5.1.1. NIPSCO also agrees to be responsible for "congestion charges," as well as "all charges, costs and expenses associated with a negative price at the Delivery Point [*i.e.*, the interconnection between a plant and MISO's grid]." *Id.* § 5.5.

Additionally, Article 5 includes a section entitled "Payments Due to Seller for Buyer's Unexcused Failure to Take." *Id.* § 5.3. That section requires NIPSCO to pay Iberdrola's "Cost to Cover" if NIPSCO "fails to take Buyer's Metered Output," unless the failure to take is excused by an Iberdrola default or by a "Force Majeure Event." *Id.* In turn, "Force Majeure Event" is defined in Article 6. The definition includes the standard "acts of God" events, but it specifies in addition that "curtailment by Midwest[2] ISO, or its successor, at the Delivery Point for any reason that prevents either Party from performing under this Agreement will constitute a Force Majeure Event." *Id.* § 6.1.2.

The last major section of the PPAs that is relevant to this case is entitled "Voluntary Curtailment by Buyer." This section gives NIPSCO the power to instruct Iberdrola to stop delivering electricity to the grid at any time. *Id.* § 5.4. If NIPSCO chooses to exercise this option, however, it must comply with certain notice requirements and pay Iberdrola's Cost to Cover for

---

[2] The "M" in MISO actually stands for "Midcontinent." The use of "Midwest" in the PPAs is presumably a drafting error.

the period of curtailment. *Id.* §§ 5.4.1, 5.4.3. The definition of "Cost to Cover" for purposes of this section is substantially identical to the definition of "Cost to Cover" for purposes of the "Unexcused Failure to Take" section. *Compare id.* § 5.3.2, *with id.* § 5.4.3.

**E.     Previous Regulatory System**

Because wind power plants produce electricity only when the wind is blowing, they were categorized as "Intermittent Resources" under the regulatory system in place in 2007 when the parties executed the PPAs. Pls.' SOF ¶ 53. The intermittent nature of wind power plants means that the plants do not necessarily produce power when consumers are demanding it, and sometimes the plants generate more power than is needed or can be accommodated by the grid. *Id.* ¶ 56. At the time the PPAs were executed, MISO sometimes needed to stop such overproduction by placing telephone calls to individual wind plants and ordering them to curtail their production for a period of time. *Id.* During these "manual curtailments" at the Iberdrola plants, NIPSCO did not pay Iberdrola the Cost to Cover, and Iberdrola never demanded such payments. *Id.* ¶ 57.

**F.     Regulatory Change**

Partly to address the inefficiencies of manual curtailments, MISO created a new category of energy resource in 2010, the "Dispatchable Intermittent Resource" ("DIR"), and began using an automated system known as "Security Constrained Economic Dispatch" ("SCED") to manage this resource category. *Id.* ¶¶ 60–62; Def.'s SOF ¶ 19. The new system requires market participants, like NIPSCO, to set a minimum LMP at which they are willing to sell electricity to MISO. Def.'s SOF ¶¶ 32–33. That price can be as high as $1000/MWh (megawatt-hour) or as low as negative $500/MWh. Pls.' SOF ¶ 22. When the LMP drops below the market participant's minimum price, SCED automatically sends a signal from MISO to the participant's

7

wind plants ordering them to "dispatch down" (*i.e.*, stop delivering power to the grid). *Id.* ¶ 63; Def.'s SOF ¶ 38.

Most wind plants, including the Iberdrola plants, were required to convert to DIR by March 1, 2013. Pls.' SOF ¶ 62. Since then, the need for manual curtailments from MISO has been reduced, but it has not been eliminated. Def.'s SOF ¶¶ 43–45; Pls.' Resp. Def.'s SOF ¶¶ 43–45.

## G.      Response to DIR

Once the Iberdrola plants had converted to DIR, NIPSCO was required as the market participant to set the minimum price at which it would sell the plants' electricity to MISO. Def.'s SOF ¶¶ 32–33. After considering various options—including offering the electricity to MISO at negative prices—NIPSCO settled on $0/MWh. Pls.' SOF ¶ 66. The consequence is that, when the LMP is $0/MWh or more, the Iberdrola plants generally run. *Id.* ¶ 67. Under those circumstances, NIPSCO sells the power produced to MISO at the LMP and pays Iberdrola the contract price (around $50/MWh). *Id.* When the LMP falls below $0/MWh, however, MISO's SCED system sends a dispatch-down order to the Iberdrola plants, and they are then obliged to go offline. *Id.*

Since the plants started receiving automated dispatch-down orders through SCED, Iberdrola has billed NIPSCO the Cost to Cover for the time the plants are dispatched down. *Id.* ¶ 68. But NIPSCO has refused to pay, insisting that the PPAs do not require such payments. *Id.*

## H.      Procedural Background

In this lawsuit, Iberdrola claims that NIPSCO's refusal to pay the Cost to Cover violates two express provisions of the PPAs, as well as the implied covenant of good faith and fair dealing. NIPSCO's primary justification for not paying is its contention that dispatch-down

orders constitute "curtailment[s] by [MISO] at the Delivery Point," thus qualifying as Force Majeure Events under the PPAs. *Id.* Both parties have filed motions for summary judgment. They also have submitted expert reports and motions to exclude portions of each other's report.[3]

After briefing on these motions was completed and the Court had issued a minute order denying both motions for summary judgment (but had yet to issue a written opinion), the Seventh Circuit decided a strikingly similar case, *Benton Cty. Wind Farm LLC v. Duke Energy Ind., Inc.*, 843 F.3d 298 (7th Cir. 2016). The plaintiff in *Benton* was also a wind power plant seeking payment under a PPA from a utility for electricity that was not produced because of the utility's bid of $0/MWh in MISO's markets. The appellate court reversed the district court's grant of summary judgment to the defendant utility and remanded, ordering the district court to instead enter summary judgment in favor of the plaintiff wind power plant. Iberdrola and NIPSCO have since filed supplemental briefing to address *Benton*.

## II. Analysis

Iberdrola and NIPSCO have both moved for summary judgment on Iberdrola's breach of contract claim. In addition, NIPSCO has moved for summary judgment on Iberdrola's alternative claim for breach of the implied covenant of good faith and fair dealing. A motion for summary judgment will be granted if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006).

As is true in most jurisdictions, the elements of a breach of contract claim under New York law[4] are: "(1) existence of a contract; (2) performance by the plaintiff; (3) breach by the

---

[3]     On the same day it issued this opinion, the Court issued a separate opinion granting in part and denying in part the parties' motions to strike portions of the other side's expert reports.

defendant; and (4) resulting damages." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009). Most of the parties' arguments in favor of summary judgment concern the third element—breach—but NIPSCO also argues that, if the PPAs must be interpreted as Iberdrola contends, the PPAs are entirely void. The Court will begin by addressing the issue of breach.

**A.     Breach of § 5.3: Unexcused Failure to Take**

The first contract provision Iberdrola claims NIPSCO has breached is § 5.3.1, "Payments Due to Seller for Buyer's Unexcused Failure to Take." That section reads:

> If Buyer fails to take Buyer's Metered Output and such failure to take is not excused by an Event of Default by Seller or Force Majeure Event, then Buyer shall pay to Seller Seller's Cost to Cover.

PPA § 5.3.1. For purposes of this provision, "Seller's Cost to Cover" can be calculated in two ways. The first applies if the wind power plants actually produce electricity during the time of NIPSCO's unexcused failure to take. *Id.* § 5.3.2(i). The second applies if a wind plant "does not generate electric energy . . . in whole or in part during the period of [NIPSCO's] unexcused failure to take." *Id.* § 5.3.2(ii). In the latter case, Cost to Cover is to be calculated based on "Deemed Generated Energy," which is "the total quantity of electric energy, expressed in MWh, that would have been delivered but for [NIPSCO's] unexcused failure to take." *Id.* Deemed Generated Energy is calculated using wind speeds recorded by monitoring towers. *Id.*

According to Iberdrola, NIPSCO breached § 5.3.1 because, as a threshold matter, it failed to take the wind power plants' "Metered Output" and, in addition, this failure was not excused by a Force Majeure Event. On both points, NIPSCO disagrees.

---

[4]     The PPAs specify that New York law will govern any disputes. *See* PPA § 17.1. Neither party contests the validity of that provision.

### 1. Failure to Take Buyer's Metered Output

Iberdrola contends that NIPSCO has committed an unexcused failure to take within the meaning of § 5.3.1 each time the Iberdrola plants have been taken offline by an SCED dispatch-down order. Pls.' Mem. Supp. Summ. J. at 11–19. These circumstances constitute an unexcused failure to take, Iberdrola argues, because NIPSCO caused the dispatch-down orders to issue by setting its offer price where it did. *Id.* In other words, as Iberdrola sees it, NIPSCO's price offer to MISO is a refusal to take electricity from Iberdrola whenever the electricity does not fetch the designated price.

For its part, NIPSCO maintains that no failure to take under § 5.3.1 occurs when the wind plants are dispatched down, because that section applies only when NIPSCO fails to take "Buyer's Metered Output," which is defined in Article 1 of the PPAs ("Definitions and Interpretation") as follows:

> [F]or each hour in which the Facility is operating, the portion of instantaneous energy of the Facility, intermittent and variable within the hour, equal to (i) the total energy output of the Facility for such hour, *as measured by the Meter(s) Delivery Point*, multiplied by (ii) [NIPSCO's] Purchase Percentage (rounded to the nearest whole MW) up to a maximum amount equal to [NIPSCO's] Designated MW.

PPA § 1.1 (emphasis added). When no electricity is generated, none is measured at the Delivery Point. Based on this obvious fact, NIPSCO reasons that no Buyer's Metered Output exists under the PPAs when the plants are not producing power and, therefore, that no "failure to take Buyer's Metered Output" can exist either. Def.'s Mem. Supp. Summ. J./Resp. Br. at 16. The argument, in sum, is that one cannot fail to take something that does not exist.

Iberdrola responds that "Buyer's Metered Output" cannot be understood as narrowly as the term's definition might suggest, because the PPAs explicitly contemplate that NIPSCO may

be obliged to pay the Cost to Cover for failures to take when the wind plants are not generating power. Pls.' Reply Br./Resp. Br. at 12–13. Specifically, § 5.3.2(ii) establishes how to calculate the Cost to Cover when the wind farms "do[ ] not generate electric energy . . . during the period of [NIPSCO's] unexcused failure to take." PPA § 5.3.2(ii). Under those circumstances, the Cost to Cover is to be based on "Deemed Generated Energy," which is calculated using measured wind speeds and other factors. *See id.*

At first glance, the apparent tension within § 5.3 would suggest that the meaning of "failure to take Buyer's Metered Output" is ambiguous. Whether ambiguity is present is a question of law to be decided by the Court. *Trade Fin. Partners*, 573 F.3d at 407. In determining whether an ambiguity exists, the Court must consider only the four corners of the contract itself; "[i]t is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1272 (7th Cir. 1996) (applying New York law). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) (citations omitted).

Under New York law, the existence of two ways to read a contract term in isolation is not dispositive of the question of ambiguity. As the Seventh Circuit has explained:

> When faced with conflicting interpretations of a [contract's] clause, New York law directs the court to interpret the clause so as to give reasonable and effective meaning to all terms and produce no meaningless clause. The court must consider the entire contract and choose the interpretation . . . which best accords with the sense of the remainder of the contract.

*AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 820 (7th Cir. 2002) (citations and internal quotation marks omitted); *see also Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002) (applying New York law and explaining that "where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect"). The Court is thus tasked with interpreting § 5.3 in a way that will "produce no meaningless clause." *AM Gen. Corp.*, 311 F.3d at 820.

The only way to prevent the Cost to Cover calculation method in § 5.3.2(ii)—which explicitly applies when no energy is produced during an unexcused failure to take—from being meaningless is to understand "failure to take Buyer's Metered Output" as something that can occur even when NIPSCO prevents any Output from being created in the first place. NIPSCO's offer price of $0/MWh prevents Iberdrola's plants from generating electricity when the LMP drops below that price point. In such a scenario, NIPSCO is thus choosing not to take power that the plants would otherwise produce, a possibility anticipated by § 5.3.2(ii). The drafting of the PPAs might have been clearer, but the parties' intent is unambiguous on the face of the contract: NIPSCO can fail to take electricity by preventing its production.[5]

The Court's conclusion on this point is reinforced by the Seventh Circuit's recent decision in *Benton Cty. Wind Farm LLC v. Duke Energy Ind., Inc.*, 843 F.3d 298 (7th Cir. 2016), a case involving a nearly identical dispute between a wind power plant in MISO's system and a utility that had contracted to buy the plant's electricity. As in this case, the utility in *Benton* decided to bid $0/MWh in MISO's markets, resulting in the frequent issuance of dispatch-down

---

[5]     It bears noting that this reading does not render the phrase "as measured by the Meter(s) Delivery Point" in the definition of "Buyer's Metered Output" superfluous, because this phrase can be reasonably read as merely setting forth a standardized method of measuring the total energy output—namely, the method by which energy would be measured by the meter that is set up to operate at the delivery point, if the energy were to be produced. *See* PPA § 1.1 (defining "meter" as "an instrument or instruments . . . to measure and record the volume of Buyer's Metered Output"). NIPSCO has not argued otherwise in its briefs.

orders. *Id.* at 300. The district court had granted summary judgment to the defendant, Duke Energy, on the basis that Duke was not obliged under the PPA in question to pay for electricity that the plaintiff, Benton County Wind Farm, did not actually produce because of a dispatch-down order. *See Benton Cty. Wind Farm LLC v. Duke Energy Ind., Inc.*, No. 13 C 1984, 2015 WL 12559885, at *17–21 (S.D. Ind. July 8, 2015). The PPA required Duke to take any electricity that reached the "Point of Metering," and the district court reasoned that power never produced does not qualify. *Id.* But the court of appeals was not persuaded by the district court's reading. Instead, the court granted summary judgment for Benton, concluding that Duke owed Benton liquidated damages for the losses incurred while Benton's wind plant was dispatched down. *See Benton*, 843 F.3d at 303, 305. Reading the PPA in this case to let NIPSCO avoid paying the Cost to Cover when Iberdrola's plants are dispatched down would be even less appropriate than it was in *Benton*. This is because, here, another provision of the parties' contract—that is, the definition of the "Cost to Cover" under § 5.3.2—explicitly contemplates a failure to take when the plants are not generating power.

Notably, if the Court were to accept NIPSCO's reading of "failure to take," the company would be able to evade the PPAs entirely by setting its offer price at the maximum of $1000/MWh, thereby ensuring that Iberdrola's plants never generated power (because the LMP never goes that high). But even NIPSCO concedes that it would be obliged to pay Iberdrola the Cost to Cover if it set its offer price at $1000/MWh, implicitly recognizing that its position on the meaning of "failure to take" is indefensible when taken to its logical end. *See* Def.'s Mem. Supp. Summ. J./Resp. Br. at 30–31. For these reasons, the Court holds that, because NIPSCO chose to set its offer price at $0/MWh, NIPSCO "fails to take Buyer's Metered Output" within

the unambiguous meaning of § 5.3.1 of the PPAs when the power plants are dispatched down due to a negative LMP.

## 2. Force Majeure Event

Because NIPSCO has engaged in "failures to take" within the meaning of § 5.3.1, the question becomes whether these failures to take are "unexcused," as they must be for NIPSCO to be obliged to pay the Cost to Cover. The answer depends on whether the failures to take are "excused by [a] Force Majeure Event." *See* PPA § 5.3.1.

The definition of "Force Majeure Event" from the PPAs is lengthy but worth providing in whole. The most pertinent portions are italicized.

### 6.1 <u>Definition.</u>

6.1.1 "<u>Force Majeure Event</u>" means *any act or event that delays or prevents a Party from timely performing its obligations under this Agreement or from complying with conditions required under this Agreement if such act or event, despite the exercise of Commercially Reasonable Efforts*, cannot be avoided or mitigated by, and is beyond the reasonable control of and without the fault or negligence of, the Party relying thereon as justification for such delay, nonperformance or noncompliance.

6.1.2 Without limiting the generality of the foregoing, Force Majeure Events may include, without limitation, acts of God; actions of the elements such as heavy rains, floods, earthquakes, hurricanes, tornadoes, lightning, ice storms, landslides, mudslides, high winds of sufficient strength or duration to materially damage the Facility or significantly impair its operation for a period of time longer than normally encountered by wind energy facilities under comparable conditions; subsurface or other site conditions (including, without limitation, environmental contamination, archaeological or other protected cultural resources, and endangered species or protected habitats); explosion; fire; epidemic; sabotage; terrorism; transportation delays; unavailability of materials; defective equipment; an act of public enemy; war; blockade; civil insurrection; riot; civil disturbance, strike or other labor difficulty caused or suffered by a Party beyond the reasonable control of such Party or its Affiliates (even if such difficulties could be resolved by conceding to the demands of a

labor group); or *any restraint or restriction imposed by Applicable Law or other acts of Governmental Authorities*, which by exercise of due diligence and in compliance with Applicable Law a Party could not reasonably have been expected to avoid and to the extent which, by exercise of due diligence and in compliance with Applicable Law, has been unable to overcome (so long as the affected Party has not applied for or assisted with such act by a Governmental Authority). *A curtailment by Midwest ISO, or its successor, at the Delivery Point for any reason that prevents either Party from performing under this Agreement will constitute a Force Majeure Event.*

6.1.3 Notwithstanding the foregoing, the term "Force Majeure Event" does not include (1) economic conditions that render a Party's performance of this Agreement at the Contract Price unprofitable or otherwise uneconomic (including Buyer's ability to buy energy or Environmental Attributes at a lower price, or Seller's ability to sell energy or Environmental Attributes at a higher price, than the Contract Price), or (2) inability of a Party to make payment when due under this Agreement, unless the cause of such inability is an event that would otherwise constitute a Force Majeure Event as described above.

The definition begins with a general description, followed by a nonexhaustive list of events that "may" constitute Force Majeure Events, including "restraint[s] or restriction[s] imposed by Applicable Law or other acts of Governmental Authority." *Id.* § 6.1.2. The definition then provides unequivocally that a "curtailment by Midwest ISO, or its successor, at the Delivery Point for any reason that prevents either Party from performing under this Agreement will constitute a Force Majeure Event." *Id.*

One of NIPSCO's underdeveloped arguments is that the creation of DIR constitutes a "restraint or restriction imposed by Applicable Law or other acts of Governmental Authority" and thus is a Force Majeure Event. Def.'s Mem. Supp. Summ. J./Resp. Br. at 13. NIPSCO asserts that the DIR categorization "prevents NIPSCO and Iberdrola from performing their obligations under the PPAs as the parties intended," excusing "NIPSCO from any obligation to pay a Cost to Cover when Plaintiffs' plants are curtailed because the market clearing price is

below $0/MWh." *Id.* at 13–14. NIPSCO adds in its reply brief—in a similarly conclusory fashion—that the creation of DIR "constituted a fundamental regulatory shift," and "[s]uch a fundamental shift constitutes a 'restraint or restriction imposed by Applicable Law.'" Def.'s Reply Br. at 12. These unelaborated assertions do not explain how the creation of DIR interfered with NIPSCO's performance and its ability to pay the Cost of Cover, and summary judgment thus cannot be granted on that basis.

NIPSCO presents a more developed argument that each individual dispatch-down order is "a curtailment by [MISO]" as meant in § 6.1.2 and is therefore a Force Majeure Event. Def.'s Mem. Supp. Summ. J./Resp. Br. at 13–16. The dispatch-down orders, NIPSCO points out, technically come from MISO (through its SCED system), and NIPSCO cannot control or predict when the LMP will drop below the company's offer price and trigger an order. *Id.* at 14. Put differently, although NIPSCO controls its price offer, it asks the Court to read the phrase "curtailment by [MISO] . . . for any reason" to include curtailments by MISO that NIPSCO has induced, rather than including only those curtailments that MISO imposes for its own, independent reasons.

Iberdrola responds that accepting NIPSCO's interpretation of this phrase would contravene the parties' intent by improperly allowing NIPSCO to avoid the risk of negative prices that it expressly undertook in § 5.5 of the PPAs. Pls.' Reply Br./Resp. Br. at 11, 26–29. In that section, the parties expressly agreed that "[NIPSCO] shall be responsible for all charges, costs and expenses associated with a negative price at the Delivery Point." PPA § 5.5. In addition, Iberdrola explains that the phrase "curtailment by [MISO]" can reasonably be read to exclude dispatch-down orders. Dispatch-down orders—although they come from MISO's SCED system—are not curtailments *by MISO*, Iberdrola argues, because the orders are issued

17

automatically based on NIPSCO's own offer price, which only NIPSCO controls. Pls.' Reply Br./Resp. Br. at 3–5.[6]

Iberdrola has the better side of this argument. As the Seventh Circuit observed thirty years ago (coincidentally, in another case involving NIPSCO), "[a] *force majeure* clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract." *N. Ind. Pub. Serv. Co. v. Carbon Cty. Coal Co.*, 799 F.2d 265, 275 (7th Cir. 1986) (rejecting contention that a regulator's refusal to allow NIPSCO to pass its losses on to its consumers constituted a *force majeure* event). Here, in § 5.5 of the PPAs, NIPSCO expressly assumed the risk of a negative LMP by agreeing to be "responsible for all charges, costs and expenses" associated with that risk. PPA § 5.5. By setting its offer price to $0/MWh and refusing to pay the Cost to Cover, however, NIPSCO has effectively shifted this risk to Iberdrola: when the LMP is negative, NIPSCO loses nothing, yet Iberdrola must cease production and is not compensated for this opportunity cost. Reading the Force Majeure provisions so as to allow NIPSCO to shift risk to Iberdrola in this manner would render § 5.5 meaningless—if NIPSCO could avoid the costs "associated with a negative price at the Delivery Price" by simply setting its offer price at $0/MWh, then there would be no reason to require NIPSCO to bear such costs under § 5.5. New York contract law requires the Court to avoid such a result. *AM Gen. Corp.*, 311 F.3d at 820. The Court therefore concludes that "curtailment by

---

[6]     At this juncture, the Court notes that both sides—and their experts—also spend considerable time debating whether NIPSCO could have avoided the dispatch-down orders using "Commercially Reasonable Efforts." *See, e.g.*, Pls.' Mem. Supp. Summ. J. at 15–16; Def.'s Mem. Supp. Summ. J./Resp. Br. at 26–30. This inquiry, however, is not called for under the PPAs. Although the PPAs' general definition of "Force Majeure Event" excludes "any act or event that delays or prevents a Party from timely performing its obligations . . . if such act or event, *despite the exercise of Commercially Reasonable Efforts*, cannot be avoided or mitigated," this general definition does not apply to "curtailment[s] by [MISO]," which categorically qualify as Force Majeure Events. PPA § 6.1.1 (emphasis added); *id.* § 6.1.2; *see also id.* § 1.1 (defining the term "Commercially Reasonable Efforts").

[MISO]" unambiguously excludes the dispatch-down orders at issue in this case, which are triggered by a negative LMP because of NIPSCO's decision to set its offer price at $0/MWh.

For its part, NIPSCO argues that reading the phrase "curtailment by MISO" to include dispatch-down orders would not render § 5.5 meaningless because, even though it has set its offer price at $0/MWh, NIPSCO continues to bear the risk of a negative LMP. Def.'s Mem. Supp. Summ. J./Resp. Br. at 33. In support, NIPSCO relies upon an expert report showing that, for each month from March 2013 to January 2014, NIPSCO paid MISO due to negative LMPs during as many as seventy hours per month. *Id.*; *see* Def.'s Ex. 1, Adamson Decl. ¶¶ 107–09. The expert report explains, however, that NIPSCO must sometimes pay MISO due to a negative LMP only because there can be a lag between the time when the LMP drops below $0 and the time when MISO's SCED sends a dispatch order to the power plants. *See* Def.'s Ex. 1 ¶ 108 n.5. In other words, NIPSCO must pay some costs only because the dispatch-down technology does not react instantaneously to fluctuations in the market price. But just because NIPSCO still bears *some* risk of a negative LMP during this lag time does not mean that it has shifted *no* risk of a negative LMP to Iberdrola. And shifting *any* such market risk to Iberdrola is enough to run afoul of § 5.5 of the PPAs, which leaves NIPSCO "responsible for *all* charges, costs and expenses" associated with a negative LMP. PPA § 5.5. Iberdrola makes precisely this point in its response brief, *see* Pls.' Reply Br./Resp. Br. at 27, and NIPSCO leaves it unrebutted.

Also supporting the Court's conclusion that "curtailments by [MISO]" do not cover dispatch-down orders is the fact that NIPSCO exercises control over its offer price. In this regard, it is instructive to consider the difference between dispatch-down orders and manual MISO curtailments. According to Iberdrola, to avoid nullification of § 5.5 and give "curtailment by [MISO]" the meaning the parties intended, this phrase must be understood to refer only to the

manual MISO curtailments that existed at the time the PPAs were executed, or their equivalent. Pls.' Reply Br./Resp. Br. at 3–5.[7] The parties agree that manual MISO curtailments (which have continued to occur occasionally since the DIR category was created) are within MISO's exclusive control. By contrast, dispatch-down orders—although they are transmitted by MISO's automated SCED system—are issued based on NIPSCO's offer price, which NIPSCO itself controls. *Id.* Thus, Iberdrola argues, a dispatch-down order is not a curtailment *by MISO* within the meaning of the PPAs. Iberdrola's point is well-taken. The Court agrees that NIPSCO's ability to exercise control over its offer price buttresses the conclusion that the dispatch-down orders do not qualify as a Force Majeure Event. *See Kel Kim Corp. v. Cent. Markets, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987) ("*[F]orce majeure* clauses . . . excus[e] nonperformance due to circumstances *beyond the control of the parties*.") (emphasis added).[8]

Further underscoring this point is NIPSCO's concession that it would be required to pay Iberdrola the Cost to Cover (in other words, to perform its contractual obligations) if it chose to set its offer price at $1000/MWh, as the new regulatory regime under the creation of DIR leaves NIPSCO at liberty to do. *See* Def.'s Mem. Supp. Summ. J./Resp. Br. at 30–31. NIPSCO offers

---

[7] NIPSCO argues that dispatch-down orders should be treated as equivalent to manual curtailments because most dispatch-down orders, like manual curtailments, occur when there is congestion on the electricity grid. Def.'s Mem. Supp. Summ. J. Resp. Br. at 14–16. For two reasons, this argument is unpersuasive. First, although congestion drives down the LMP, which, in turn, triggers a dispatch-down order (at least when the LMP drops below NIPSCO's offer price), there remains the fact that NIPSCO has control over its offer price; the lower it sets its offer price, the less frequently congestion will result in a dispatch-down order. Characterizing the key trigger for dispatch-down orders as congestion, rather than NIPSCO's offer price, is thus little more than a red herring. Second, and more importantly, both sides have conceded that MISO's reasons for ordering manual curtailments are known only to MISO. *See* Def.'s Suppl. Br. at 4. As such, any comparison between MISO's motives for manual curtailments and the factors driving particular dispatch-down orders is not possible on this record.

[8] Elaborating on this point further, Iberdrola aptly analogizes this situation to one in which an investor instructs his stock broker to sell at a certain price. Pls.' Reply Br./Resp. Br. at 4. Although the investor has no control over the stock price, the decision to sell is undeniably the investor's. *Id.* Similarly, the decision that a dispatch-down order will issue whenever the LMP drops below $0/MWh is NIPSCO's, even though NIPSCO cannot predict precisely when that will happen. *Id.*

no principled explanation as to why dispatch-down orders would trigger its obligation to pay the Cost to Cover if it had chosen an offer price of $1000/MWh, but not an offer price of $0MWh.

The Seventh Circuit's decision in *Benton* supports this Court's conclusion as well. Although the PPA in *Benton* did not include the "curtailment by [MISO]" language at issue in this case, the court of appeals interpreted the PPA in light of the reality that wind power companies in the MISO system would have had great difficulty securing construction financing if the risk of increased competition from other producers were not allocated to the utility that purchased the wind power. The court explained:

> Potential buyers and sellers of electricity could and did foresee when negotiating this contract (and others like it) that electrical grids may be swamped by new sources of renewable power, which usually is located far from the centers of demand. They needed to allocate the risk of that development, which predictably would compel MISO to alter its rules for which sources could put power on the grid. Allocating the risk to Benton would have made it hard, perhaps impossible, to finance the project's construction, while leaving Duke and similar utilities no incentive to expand the regional grids as wind power became available. . . . We read this contract as allocating the risk to Duke . . . .

*Benton*, 843 F.3d at 297. Likewise, if Iberdrola and NIPSCO had intended to allocate the risk of low prices to Iberdrola, the PPAs would present the very financing and incentive problems the Seventh Circuit describes in *Benton*. Consistent with the economic infeasibility of such an arrangement, the express language of § 5.5 shows that the parties instead intended to allocate the risk of low prices—specifically, a "negative price at the Delivery Point"—not to Iberdrola, but to NIPSCO. PPA § 5.5. Given this express language, alongside the economic realities of the wind power industry as discussed in *Benton*, it is all the more apparent that the PPAs cannot reasonably be read to allow Iberdrola's wind power plants to eat the cost whenever the LMP falls below NIPSCO's offer price.

In sum, the Court concludes as a matter of law that the term "curtailment by [MISO]" under § 6.1.2 of the PPAs unambiguously excludes curtailment of production via dispatch-down orders that are automatically sent by the SCED when the LMP drops below NIPSCO's $0/MWh offer price. This reading is a reasonable construction of § 6.1.2, in that dispatch-down orders, although sent from MISO's automated SCED, are triggered not by MISO but instead by NIPSCO's own decision regarding where to set its offer price. Furthermore, to construe § 6.1.2 otherwise would have the result of rendering § 5.5 meaningless. The Court is obligated to avoid such a result. *See AM Gen. Corp.*, 311 F.3d at 820; *Seabury*, 289 F.3d at 69. Finally, this construction of § 6.1.2 also comports with the Seventh Circuit's recent decision in *Benton*. For all of these reasons, the Court holds that, under the unambiguous terms of the PPAs, the dispatch-down orders occasioned by NIPSCO's offer price cause failures to take that are not excused by a Force Majeure Event. The PPAs therefore require NIPSCO to pay Iberdrola the Cost to Cover for shutdowns occasioned by these orders.

**B.      Breach of § 5.4: Voluntary Curtailments**

Because the unambiguous terms of the PPAs require NIPSCO to pay Iberdrola the Cost to Cover under § 5.3, the Court need not address whether Iberdrola would be entitled to summary judgment in its favor based upon a breach of § 5.4. Nevertheless, for the sake of completeness, the Court holds that the unambiguous terms of § 5.4 are an independent basis for requiring NIPSCO to pay Iberdrola the Cost to Cover.

Iberdrola claims that NIPSCO's refusal to pay the Cost to Cover violated not only § 5.3, but also § 5.4, which is entitled "Voluntary Curtailments by Buyer." Section 5.4 gives NIPSCO the power to order the wind farms to "curtail deliveries of Buyer's Metered Output . . . at any time, in whole or in part, and for any duration specified by [NIPSCO]," so long as NIPSCO

complies with certain notice requirements and pays the wind farms the Cost to Cover. PPA §§ 5.4.1, 5.4.3. As noted above, the method for calculating the Cost to Cover for purposes of § 5.4 is substantially identical to the method set forth under § 5.3. *See id.* §§ 5.3.2, 5.4.3. According to Iberdrola, § 5.4 requires NIPSCO to pay Iberdrola's Cost to Cover whenever the plants are dispatched down because of a negative LMP, because NIPSCO voluntarily set its offer price at $0/MWh. Pls.' Mem. Supp. Summ. J. at 9–11.

NIPSCO offers two arguments in response. First, it contends that curtailments via the dispatch-down orders are not "voluntary" because "DIR is forcing NIPSCO to make a price offer" and the dispatch-down orders are caused by circumstances outside of NIPSCO's control (namely, congestion on the power grid that drives down the LMP). Def.'s Mem. Supp. Summ. J./Resp. Br. at 20–21. NIPSCO elaborates on this point in its reply brief, characterizing the dispatch-down orders as "curtailments by MISO" rather than "voluntary curtailments by NIPSCO." Def.'s Reply Br. at 13.

In large part, this first argument mirrors NIPSCO's arguments regarding whether the dispatch-down orders are a "curtailment by [MISO]" for purposes of the Force Majeure provisions discussed *supra*. For the same reason the Court rejected this argument with regard to those provisions, the Court rejects it with regard to § 5.4. NIPSCO's assertion that the DIR system "forced" it to make a price offer ignores the undisputed fact that NIPSCO was free to choose an offer price anywhere from $1000/MWh to negative $500/MWh. *See* Pls.' SOF ¶ 22. NIPSCO voluntarily chose an offer price of $0/MWh. *Id.* ¶ 66. By setting its offer price at $0/MWh, NIPSCO has effectively ordered the wind farms to cease production every time the LMP falls below this level. The fact that, as a technical matter, these orders come in the form of

23

dispatch-down orders via MISO's automated SCED system does not make the orders any less the product of NIPSCO's choice to set an offer price of $0/MWh.

Second, NIPSCO argues that § 5.4 is simply inapplicable because the section comes into play only if NIPSCO invokes it by contacting the plants directly and telling them to go offline. Def.'s Mem. Supp. Summ. J./Resp. Br. at 20–22. In support, NIPSCO highlights the detailed notice requirements in the section and argues that its failure to "invoke[ ] or follow[ ]" these requirements compels the conclusion that it has not engaged in a curtailment implicating § 5.4. *Id.* at 21.

This argument, too, is unpersuasive. As an initial matter, Iberdrola points out that NIPSCO did, in fact, comply with these notice requirements by giving Iberdrola advance written notice of its decision to set its offer price at $0/MWh. Pls.' Reply Br./Resp. Br. at 19 (citing Pls.' SOF ¶ 66). In reply, NIPSCO does not contest this point. *See* Def.'s Reply at 13. Moreover, even if NIPSCO had not given this notice (or if this notice were insufficient to comply with § 5.4's requirements), the fact that NIPSCO did not comply with these requirements does not mean that its decision to set its offer price at this level could not have been a "voluntary curtailment." Without a further explanation of this point, NIPSCO's arguments do not rebut Iberdrola's position that, by choosing to set its offer price at $0/MWh, NIPSCO voluntarily curtails Iberdrola's production of wind power within the unambiguous terms of § 5.4. For these reasons, the Court concludes that NIPSCO has breached § 5.4 by failing to pay Iberdrola the Cost to Cover during these curtailments. Thus, even if NIPSCO had not also breached § 5.3, the PPAs would still require NIPSCO to pay the Cost to Cover for curtailments resulting from dispatch-down orders.

## C.     Validity of the PPAs

Finally, NIPSCO argues that the PPAs must be set aside as void if the Court concludes, as it has above, that the PPAs require NIPSCO to pay the Cost to Cover any time the plants shut down because of a dispatch-down order. Def.'s Mem. Supp. Summ. J./Resp. Br. at 17–20. According to NIPSCO, requiring such payments would unfairly subject it to significant unanticipated costs. *Id.*

New York courts have held that "performance should be excused" in the face of "a substantially unjust situation totally outside contemplation of the parties [that] an experienced draftsman would not reasonably anticipate." *Moyer v. City of Little Falls*, 510 N.Y.S.2d 813, 815 (N.Y. Sup. Ct. 1986). Here, NIPSCO has submitted no evidence that it will face a substantially unjust situation if required to pay Iberdrola the Cost to Cover for shutdowns caused by dispatch-down orders. While neither NIPSCO nor Iberdrola anticipated the creation of DIR, *see* Pls.' Resp. Def.'s SOF ¶ 34, NIPSCO has not shown that it would have been significantly better off under the old system. Instead, undisputed evidence shows that NIPSCO enjoys substantial benefits from the conversion to DIR, *see, e.g.*, Def.'s Resp. Pls.' SOF ¶¶ 75–80, and NIPSCO has offered no evidence that these gains would be reversed if it were to pay Iberdrola the Cost to Cover. NIPSCO also has offered no evidence that it executed the PPAs under the assumption that manual curtailments would continue at some particular level for the length of the contractual relationship. Under these circumstances, this case is easily distinguishable from a case like *Moyer*, where the defendant's costs under a contract undisputedly would have been increased seven-fold by the unanticipated closing of a landfill. *See* 510 N.Y.S.2d at 815.

In its supplemental brief, NIPSCO latches on to the concurring opinion in *Benton*, where Judge Posner wrote that the defendant "[c]onceivably" could have argued that the contract at issue was void on impossibility grounds. *Benton*, 843 F.3d at 310 (Posner, J., concurring). But

25

Judge Posner's observation does nothing to remedy the deficiencies described above in NIPSCO's own argument. The Court thus declines to set aside the PPAs, and Iberdrola is entitled to summary judgment in its favor.[9]

---

[9]    Because Iberdrola is entitled to summary judgment based on NIPSCO's breach of the PPAs, the Court need not address NIPSCO's argument that it is entitled to summary judgment on Iberdrola's claim for breach of the implied covenant of good faith and fair dealing. As Iberdrola makes clear in the briefing, its claim for breach of the implied covenant of good faith and fair dealing is pleaded "explicitly in the alternative" to Iberdrola's breach of contract claim. Pls.' Reply Br./Resp. Br. at 15. Indeed, under New York law, a plaintiff who prevails on a breach of contract claim cannot also prevail on a claim for breach of the implied covenant of good faith and fair dealing when the two claims are based upon the same underlying conduct. *See Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 292 (N.Y. 1995). NIPSCO's request for summary judgment on the claim for breach of the implied covenant of good faith and fair dealing is therefore moot.

### III.  Conclusion

For the reasons set forth above, Iberdrola's motion for summary judgment [66] is granted, and NIPSCO's motion for summary judgment [79] is denied. This order modifies the Court's prior order on these motions [144]. A status hearing is set for July 5, 2018, at 9:00 a.m., at which time the parties should be prepared to discuss the issue of determining damages.

**SO ORDERED**                              **ENTERED   6/18/18**

_____
**JOHN Z. LEE**
**United States District Judge**